## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON D. MARTIN,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No. 2:15-CV-2169-MHH** |
| | } | |
| **SHELBY COUNTY BOARD OF** | } | |
| **EDUCATION, et al.,** | } | |
| | } | |
| **Defendants.** | } | |

## MEMORANDUM OPINION

Plaintiff Sharon Martin is an interventionist for the Shelby County Board of Education. In that role, she works with at-risk students at Vincent Middle High School.[1] In April 2014, Ms. Martin applied for a registrar/data manager position at the school. The Board did not select Ms. Martin for the position. Ms. Martin contends that in making the hiring decision for the registrar position, the Shelby County Board of Education, the individual members of the Board, and the district superintendent discriminated against her because she is African-American. Ms. Martin asserts a Title VII claim against the Board and § 1983 claims against the individual defendants in their individual and official capacities.

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, the defendants ask the Court to enter judgment in their favor on all of Ms. Martin's claims against

---

[1] Vincent Middle High School houses students in grades 6 to 12.

them.  (Doc. 12).  The parties also ask the Court to strike various evidentiary submissions.  (Docs. 20, 22).  For the reasons explained below, the Court grants the defendants' motion for summary judgment.

## I.   STANDARD OF REVIEW

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  FED. R. CIV. P. 56(c)(1)(A).  "The court need consider only the cited materials, but it may consider other materials in the record."  FED. R. CIV. P. 56(c)(3).  When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party.  *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).  In this opinion, the Court describes the evidence accordingly.

## II.     FACTUAL BACKGROUND

Ms. Martin has worked for the Shelby County Board of Education for nearly 20 years.  Ms. Martin received an associate's degree in computer science in 1988 and worked in computer programming from approximately 1988 to 1994.   (Doc. 12-1, pp. 5, 9-10, 47).  In 1999, the Shelby County Board of Education hired Ms. Martin as a substitute teacher, and she later became a library aide at Vincent Middle High School.  (Doc. 12-1, pp. 12, 58).  In 2004, Ms. Martin moved to the interventionist position at Vincent Middle High School.  (Doc. 12-1, pp. 12, 58).  She has held that position ever since.  (Doc. 12-1, pp. 13, 58-59).

As an interventionist, Ms. Martin monitors at-risk students assigned to in-school detention.  She collects the students' assignments from teachers, gives the assignments to the students, and then returns the completed assignments to the teachers.  (Doc. 12-1, p. 13).  Ms. Martin monitors the students until they complete the assigned detention time.  (Doc. 12-1, p. 14).  As an interventionist, Ms. Martin has limited access to INOW, the school's student information software.  Ms. Martin uses the software to look up students' schedules.  (Doc. 12-1, p. 14; *see* Doc. 12-7, p. 3).

By all accounts, Ms. Martin is an effective interventionist.  Clint Dixon, the

principal at Vincent Middle High School for the 2012-13 and 2013-14 school years, testified that Ms. Martin is an "asset to Vincent Middle/High." (Doc. 12-2, p. 12). According to Mr. Dixon, Ms. Martin "did a great job in the role of interventionist," and he "never had to correct her for anything." (Doc. 12-2, p. 17). Ms. Martin asserts that she has received "stellar evaluations" and that her supervisors have acknowledged that she has "a great work ethic," is "well-organized," and "relate[s] well to peers and students." (Doc. 19-1, ¶ 2).

Ms. Martin's 2013 and 2014 performance evaluations are consistent with this assertion. Mr. Dixon completed Ms. Martin's 2013 performance evaluation. (Doc. 19-9, pp. 1-2). Mr. Dixon indicated that Ms. Martin demonstrated excellence in 13 of 15 identified categories, and she showed strength in the two other categories. Mr. Dixon did not report that Ms. Martin needed improvement or performed unsatisfactorily in any category. (Doc. 19-9, p. 1). Under a section of the 2013 evaluation titled "Strength and Superior Performance," Mr. Dixon wrote:

> Ms. Martin does an outstanding job as our ISD Interventionist. She communicates effectively with teachers to ensure students are doing their assigned tasks, and she effectively monitors students in ISD to make sure they are actively working. Students have great respect for Ms. Martin because she develops positive relationships with students.

(Doc. 19-9, p. 1). Mr. Dixon wrote "N/A" under the section of the 2013 evaluation titled "Deficiencies or Inappropriate Behaviors." (Doc. 19-9, p. 2). With respect

4

to goals or improvement programs, Mr. Dixon made two recommendations. He stated that Ms. Martin should "[c]ontinue to foster positive relationships with students and work with them on making positive choices so they can remain in class," and he asked Ms. Martin to "[f]ind time while students are in ISD to work on Ripple Effects software." (Doc. 19-9, p. 2).

Mr. Dixon also completed Ms. Martin's 2014 performance evaluation. (Doc. 19-10, pp. 1-2). Mr. Dixon indicated that Ms. Martin demonstrated excellence in nine of 15 categories and showed strength in the six other categories. Mr. Dixon did not find that Ms. Martin's performance in any category was unsatisfactory or needed improvement. (Doc. 19-10, p. 1). Under the section of the 2014 evaluation titled "Strength and Superior Performance," Mr. Dixon wrote:

> Ms. Martin is outstanding. She monitors student behavior in ISD and ensures they complete their assignments. She treats them with respect while holding them accountable for their actions and their behavior in ISD. Ms. Martin communicates as needed with administrators to ensure student success. She is respected by students and staff alike.

(Doc. 19-10, p. 1). Under the section of the 2014 evaluation titled "Deficiencies or Inappropriate Behaviors," Mr. Dixon wrote, "none." (Doc. 19-10, p. 2). With respect to goals or improvement programs, Mr. Dixon stated that Ms. Martin should "[c]ontinue to foster positive relationships with students in ISD and help

them develop strategies to avoid disciplinary actions." (Doc. 19-10, p. 2).[2]

In March 2014, Ms. Martin received the "Shining Star" award. (Doc. 12-1, p. 15; Doc. 19-1, ¶ 2). The Alabama Education Association presents the award to an association member who works in a support staff position at a local school. (Doc. 12-1, p. 15). The award recognized Ms. Martin "as the state education support professional of the year" for "outstanding service." (Doc. 19-1, ¶ 9). In May 2014, the student government association at Vincent Middle High School recognized Ms. Martin as a staff member who demonstrates "good spirit with the teachers, the co-workers, the community, and [who] show[s] good leadership skills." (Doc. 12-1, p. 16).

According to Ms. Martin, over her many years of service to the Shelby County Board, she has asked for an opportunity to help in the front office, but she has not been allowed to work there. (Doc. 19-1, ¶ 5). Nor have other African-Americans. (Doc. 19-1, ¶ 6). After Ms. Martin filed this lawsuit in 2015, the Board hired an African-American employee as a bookkeeper in the Vincent Middle

---

[2] The record contains Ms. Martin's evaluations from 2004 through 2012 for her work as Vincent Middle High School's interventionist. (Doc. 12-11, pp. 77-94). These evaluations largely are consistent with Mr. Dixon's 2013 and 2014 positive evaluations of Ms. Martin's performance. (*Compare* Doc. 12-11, pp. 77-94 *with* Doc. 19-9 *and* Doc. 19-10). The Court has highlighted Mr. Dixon's 2013 and 2014 evaluations because these evaluations took place within the year before Ms. Martin applied for the registrar/data manager position and because, as explained below, Mr. Dixon, who became principal at Vincent Middle High in 2012, selected the applicants to interview for the registrar/data manager position, and he was one of the individuals who interviewed candidates for the position.

High School front office. (Doc. 19-1, ¶ 7). To Ms. Martin's knowledge, the bookkeeper is the first African-American individual who the Board has hired in a support position in the front office at the school. (Doc. 19-1, ¶¶ 6, 7).

In 2014, Ms. Martin applied to fill a vacant position in the front office at Vincent Middle High School. Generally, to fill a vacancy within the Shelby County school district, a school administrator from the school with the vacancy asks the district's human resources department to post an open position. (Doc. 12-2, p. 5; Doc. 12-5, ¶ 4). For a 12-month contract position, like a registrar/data manager, the human resources office posts the vacancy for 10 business days, and candidates apply online. (Doc. 12-5, ¶ 4; Doc. 12-2, p. 5). The school with the vacancy assembles a team to review the online applications, select candidates to interview, and conduct interviews. (Doc. 12-2, p. 5; Doc. 12-5, ¶ 5; Doc. 12-6, p. 7). The superintendent occasionally has input into which candidates to interview for principal and central office positions at the schools in the district, but the superintendent does not select candidates to interview for positions within particular schools. (Doc. 12-6, p. 7).

During interviews, the interview panel at the school with the vacancy asks each candidate the same questions, and panel members make notes about the answers. (Doc. 12-5, ¶ 6). In 2014, the template form for assessing interviews

included a place for the panel to assign a numerical rating to each answer. (Doc. 12-5, ¶ 6). The panel members then discuss the qualities of the candidates who they interviewed and rank the candidates before determining which candidate they will recommend to human resources to fill the vacancy. (Doc. 12-5, ¶ 7).

After an interview panel submits a recommendation for hire to human resources, the human resources office provides the recommendation to the district's superintendent. (Doc. 12-4, p. 4; Doc. 12-5, ¶ 8; Doc. 12-6, pp. 11-12). The superintendent then recommends the candidate to the Board. When the superintendent recommends a candidate for a 12 month-position, the Board members do not receive information about unsuccessful applicants for the available position. (Doc. 12-5, ¶ 9). The Board members vote on the candidate who the superintendent recommends. (Doc. 12-5, ¶ 9). The Board rarely declines the candidate who the superintendent recommends. (Doc. 12-6, p. 13). Under state law, the Shelby County school system officially hires a candidate only after the Board votes. (Doc. 12-5, ¶ 9).

On April 25, 2014, the Board posted a vacancy for the registrar/data manager at Vincent Middle High School. (Doc. 12-2, p. 5; Doc. 12-5, ¶ 10). According to the job description, applicants had to have at least a high school diploma, working knowledge of basic office procedures and business machines, 30

words per minute typing proficiency, computer experience in data entry, proficiency with Microsoft Excel and Word, proficiency with email and Windows XP, good organizational skills, good phone and public relations skills, and visual acuity. (Doc. 19-4, p. 1). The registrar/data manager job description is a universal document that applies to the registrar/data manager position at each school in the Shelby County school system. (Doc. 12-6, p. 6).

The job description states that the responsibilities of a registrar/data manager are as follows:

1. Be familiar with and follow the Shelby County Board of Education and local school policies.

2. Be responsible for maintaining data management program(s) for the local school.

3. Enter data on student, staff, scheduling and other information, as assigned.

4. Process enrollment and withdrawal of students including processing of associated paperwork, records, transcripts, etc.

5. Assist parent/guardians in completing and submitting all required registration materials.

6. Perform daily, monthly, and routine tasks as required for the efficient operation of data management program(s) such as:

   • Maintaining accurate enrollment, attendance with withdrawal information on all students.
   • Maintaining accurate personnel information.
   • Maintaining accurate course, class, and scheduling

information.
- Entering other data as assigned.
- Resolving and correcting data conflicts.

7. Attend training as required.

8. Adhere to all directives regarding proper data codes and formats.

9. Assist in preparing, printing and distributing reports such as:

- Student progress reports and report cards
- Attendance reports
- Discipline reports
- Others as needed

10. Assist school administrators in preparing, interpreting and analyzing data.

11. Work with central office staff in completing all local and state requirements in a timely manner.

12. Maintain the security of any data-related computers.

13. Maintain the confidentiality of all school related business.

14. Maintain proper professional relationship with students and other employees.

15. Perform duties in a manner that promotes good public relations.

16. Assume and perform other tasks and such other responsibilities assigned by supervisor.

(Doc. 19-4, pp. 1-2).

The registrar/data manager position pays approximately $10,000 more per year than Ms. Martin's position as an interventionist. (Doc. 19-1, ¶ 8). Ms. Martin contends that she was qualified for the registrar/data manager position because of her background, experience, and years of service at Vincent Middle High School. (Doc. 12-1, p. 21). Ms. Martin and 95 other individuals applied for the registrar position. (Doc. 12-5, ¶ 10; Doc. 12-11, pp. 6-9). Mr. Dixon and the school district's INOW data administrator and trainer, Faith Pack, reviewed the applications together and selected six applicants to interview for the position. Ms. Martin was one of the six. One of the other five interview candidates is African-American. (Doc. 12-1, p. 55; Doc. 12-5, ¶ 11; Doc. 19-1, ¶ 2). The other four interview candidates are Caucasian. (Doc. 12-5, ¶ 11).

Mr. Dixon asked Ms. Pack and Vincent Middle High's student counselor, Maite Miller, to help him conduct the interviews. (Doc. 12-1, p. 18; Doc. 12-2, pp. 4, 7; Doc. 12-7, p. 3; Doc. 12-9, p. 3). Each interview took place in Mr. Dixon's office and lasted 15 to 20 minutes. (Doc. 19-1, p. 20).[3] During the interviews, the panel asked each candidate the same questions from a pre-printed form. (Doc. 12-2, p. 12; Doc. 12-3, ¶ 4; Doc. 12-9, pp. 4-5). The questions on the form include:

- What is your understanding of the job for which you are applying?

_____

[3] Ms. Jones did not appear for her interview. (Doc. 12-2, p. 12).

- Describe what experience you have had with INOW and previously STI Office, if any?

- Give some examples of how data within INOW is used for purposes other than student grades, attendance, and scheduling?

- What is SETS WEB and how does it relate to INOW?  Or, describe your experience working with individuals of diverse backgrounds and who have various native languages?

- What is FERPA?  Give 3 examples of information that would be covered by FERPA.

- How do you prioritize your work?

- How would you deal with a parent who has no documentation of Shelby County residency during registration?  If [you] suspect the family may be homeless, what do you do?

- Describe any data entry experience you have had.  Describe two possible negative consequences of data entry errors in a student information database?

- Do you prefer close supervision or do you function best when you have more autonomy?  Part of a group, or independent.

- How would you rate your people skills?  Scale of one to five.  Five is the best.  Why?

- Besides working with computers in general and INOW in particular (if applicable) what other technical expertise do you possess?

- How do you [feel] about learning a new job and/or a new piece of software?

- How would your co-workers describe you?  Give two examples of how you have helped co-workers with a task or job.

- Describe what you consider a good working environment.

- What interests you about this position?

- What questions do you have for us?

(Doc. 12-11, pp. 10-12).

In addition to these questions, the form recommends what interviewers should listen for in a candidate's answers, provides space for notes about the candidate's response to each question, and requests a numerical rating of 1 through 5 for all but two of the questions. (Doc. 12-11, pp. 10-12). During his deposition, Assistant Superintendent of Human Resources Jim Miller testified that interview panels "are supposed to score the interview itself. They'll score, and they'll rate. . . . They would rate the interview, and then after all is said and done, they would rank [the candidates] after the interview process." (Doc. 12-4, p. 11). When asked whether the interview panel would rank based on the ratings, Mr. Miller answered "I would assume so." (Doc. 12-4, p. 11).

Mr. Dixon and the other two interviewers made hand-written notes on the forms for the five candidates who they interviewed. (Doc. 12-11, pp. 10-12, 27-35, 38-46, 49-57, 59-67). In her declaration, Ms. Martin states that the interviewers' notes on the forms for her interview "do not accurately reflect all that was said" during her interview and that "some of the handwriting from those notes was

stricken through or changed." (Doc. 19-1, ¶ 16). Ms. Martin does not provide specific examples of inconsistencies, omissions, or deletions. (*See* Doc. 19-1, ¶ 16). The Court has reviewed the interview forms for Ms. Martin. (Doc. 12-11, pp. 38-46). There are two pages that contain strike-outs. (D0c. 12-11, pp. 39, 46).

With one exception, none of the interviewers' forms has numerical ratings for the candidates. (*Compare* Doc. 12-11, pp. 59-61 *with* Doc. 12-11, pp. 10-12, 27-35, 38-46, 49-57, 62-67). At the beginning of the interviews, Mr. Dixon decided not to use the numerical rating system provided on the interview forms. (Doc. 12-7, p. 7). Instead, Mr. Dixon believed that "a whole comprehensive approach would be better than using a numeric scale" to score the candidates. (Doc. 12-7, p. 7). Therefore, after each candidate's interview, the panel discussed that candidate's strengths and weaknesses, any personal knowledge that the interviewers had of the candidate, and the overall impression of that candidate. (Doc. 12-2, p. 12; Doc. 12-3, ¶ 4; Doc. 12-7, p. 7).

At the beginning of her interview, Ms. Martin told the panel about her work history. (Doc. 19-1, p. 20). She told the panel about the number of years she had worked as an interventionist and stated that as an interventionist, she has access to INOW to look up students' schedules. (Doc. 12-1, pp. 20-21). Ms. Martin explained that she worked as an owner and office manager of a construction

company from 1994 to 2009. (Doc. 19-1, ¶ 20). Ms. Martin told the panel that her tasks at the construction company included "data entry and dealing with the public." (Doc. 19-1, ¶ 25). Ms. Martin emphasized that she developed organizational, "data management, multi-tasking, and public relations skills" through her work at the construction company. (Doc. 19-1, ¶ 26; *see also* Doc. 19-1, ¶ 20).

Ms. Martin also told the interview panel about her work at an after-school care program. (Doc. 19-1, ¶ 14). Since 2011, Ms. Martin has worked part-time at the after-school care program at Chelsea Park Elementary. (Doc. 12-1, p. 10).[4] Since 2014, Ms. Martin has been in charge of the program. (Doc. 12-1, pp. 10-11). When she first started working at Chelsea Park, Ms. Martin was a counselor, and she supervised students while they were in aftercare. (Doc. 12-1, p. 10). Ms. Martin then worked as the site secretary before taking over the program. (Doc. 12-1, p. 10). Ms. Martin told the interview committee that as the site secretary of the after-school program, she interacted with parents on a regular basis. (Doc. 19-1, p. 14, ¶ 14). Ms. Martin also told the interview panel that she had received the "Shining Star" award earlier that month. (Doc. 19-1, ¶ 9).

---

[4] Chelsea Park Elementary is not part of the Shelby County school system, and the Shelby County Board does not employ Ms. Martin in her position with the Chelsea Park after-school care program. (Doc. 12-1, p. 10; Doc. 12-5, ¶ 3).

Mr. Dixon did not share Ms. Martin's 2013 and 2014 interventionist evaluations with the other interviewers because Mr. Dixon did not believe that the evaluations were "germane" to the interviews for the registrar position. (Doc. 12-2, p. 12; Doc. 12-7, p. 8). According to Mr. Dixon, Ms. Martin's interventionist job "is a very different job than the registrar's position." (Doc. 12-2, p. 12).

At the conclusion of all of the interviews, the panelists discussed all of the candidates. (Doc. 12-2, p. 14; Doc. 12-7, p. 7; Doc. 12-9, p. 3). Each panelist independently ranked the candidates, but the panelists did not write down their rankings. (Doc. 12-3, ¶ 5; Doc. 12-7, p. 12). All three panel members ranked two Caucasian females as their top candidates. (Doc. 12-3, ¶ 5; Doc. 12-7, pp. 7-8). The interview panel "talked about the pros and cons" of the two and then selected a Caucasian candidate to recommend to the superintendent. (Doc. 12-7, p. 8; *see also* Doc. 12-3, ¶ 5; Doc. 12-9, p. 3).

The Caucasian candidate who the interview panel selected, Ms. Karen George, has a high school diploma, and she has completed some college courses. (Doc. 12-2, pp. 19-20; Doc. 12-11, p. 58). She worked as a substitute teacher in the Shelby County School system for 10 years before applying for the registrar/data manager position. (Doc. 12-12, pp. 3-4, 7). She also worked as a substitute for front office staff at Vincent Middle High School. (Doc. 12-12, p. 4).

16

In this role, she assisted with pre-registration in the summer months before school started. (Doc. 12-12, p. 5). She also volunteered at Vincent Middle High School. She was a PTO officer, band booster, and a Junior ROTC booster. (Doc. 12-12, p. 5). As a substitute teacher and as a school volunteer, she did not use INOW, and she did not have access to the INOW database. (Doc. 12-12, p. 4). She indicated on her resume that she is skilled in Microsoft Word, Excel, and Power Point. (Doc. 12-, p. 58).

The interview panel did not believe that Ms. Martin's experience was superior to the experience of Ms. George, and all three interviewers believed that Ms. George had a better interview than Ms. Martin. (Doc. 12-3, ¶ 11; Doc. 12-8, ¶ 7; Doc. 12-10, ¶ 9). On the afternoon of the interviews, Mr. Dixon sent an email message to four of the candidates including Ms. Martin and let them know that he would "make a decision in the morning." (Doc. 19-2, p. 1; *see also* Doc. 12-1, p. 20). The following day, May 15, 2014, Mr. Dixon told Ms. Martin that she "had performed well in the interview" but that he had selected another candidate for the position. (Doc. 12-1, p. 19). Mr. Dixon submitted to the Board's human resources department and to the Board's high school coordinator a request to hire Ms. George for the registrar position. (Doc. 12-2, p. 16; Doc. 12-6, p. 12). The superintendent received the panel's recommendation and submitted a written

recommendation to the Board. The Board approved the superintendent's recommendation. (Doc. 12-5, ¶ 13; Doc. 12-6, p. 15; Doc. 12-11, p. 124). Before voting, the Board did not have information regarding the race of the unsuccessful candidates for the registrar/data manager position. (Doc. 12-5, ¶ 13).[5]

Ms. Martin believes that the Board's decision to hire Ms. George was discriminatory because:

> [the interview panel] had all of my information and all our applications there in front of us and it's like it was overlooked or they didn't look at it and, clearly, to me it was race. And then listening to the statements that some of the interviewers gave [in their depositions], which wasn't consistent, wasn't logical to me why they were saying people-person or ambassador or welcome committee and none of that was listed in the job applications. And I guess Ms. [Pack] said it, but she said they didn't need someone and that person looking for someone to intimidate (sic). And to me, that's a racial issue, you know, intimidate.

(Doc. 12-1, Martin Depo., p. 91). In her declaration, Ms. Martin states that "[t]he considerations of who would give the best 'first impression of the school,' being a 'one-person welcoming committee,' and making sure that the person did not come across as being 'intimidating,' as well as characterizing the decision as who would be the 'best fit,' all signal considerations of appearance that could imply race."

---

[5] Although Ms. Pack served as a Board representative on the interview panel (Doc. 12-7, p. 3), there is no evidence in the record that Ms. Pack discussed the interview process or the race of the candidates with any Board member before the Board voted on the superintendent's recommendation to hire Ms. George.

(Doc. 19-1, ¶ 19).[6]

## III.   ANALYSIS

### A.    Title VII Race Discrimination Claim Against the Board

Ms. Martin asserts a Title VII race discrimination claim against the Board based on her allegation that the Board did not hire her for the registrar/data manager position because she is African-American. Ms. Martin relies on circumstantial evidence to establish discriminatory intent. Therefore, the Court may use the *McDonnell Douglas* analytical framework to evaluate the sufficiency of her evidence.

Under that burden-shifting framework, in a failure-to-hire scenario, Ms. Martin may establish a prima facie case of discrimination by showing that: "(1) she was a member of a protected class; (2) she applied and was qualified for a position for which the employer was accepting applications; (3) despite her qualifications, she was not hired; and (4) the position remained open or was filled by another person outside of her protected class." *Trask v. Sec'y, Dept. of Veterans Affairs*, 822 F.3d 1179, 1191 (11th Cir. 2016). "The methods of presenting a prima facie

---

[6] The defendants move to strike this portion of Ms. Martin's declaration as speculation and inadmissible lay opinion testimony. (Doc. 22). The defendants have not moved to strike the nearly identical testimony that Ms. Martin offered in her deposition. The Court denies the motion to strike. The Court will consider Ms. Martin's assessment of the interview process. *See United States v. Stein*, 881 F.3d 853, 858-59 (en banc) (the district court may consider an otherwise admissible affidavit even when the affidavit is self-serving and uncorroborated by independent evidence).

case are not fixed; they are flexible and depend to a large degree upon the employment situation." *Wilson v. B/E Aerospace*, *Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).

If Ms. Martin presents a prima facie case, then the burden shifts to the Board to articulate a race-neutral basis for the employment action at issue. If the Board carries this light burden, then the burden returns to Ms. Martin to prove that the Board's stated reason for its conduct is pretext for discrimination. *See Flowers v. Troup Cty., Ga. School Dist.*, 803 F.3d 1327, 1336 (11th Cir. 2015). Ms. Martin can show that the Board's proffered reason is pretext "directly, by persuading the court that a discriminatory reason more likely than not motivated the employer, or indirectly, by showing 'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable fact finder could find them unworthy of credence.'" *Paschal v. United Parcel Serv.*, 573 Fed. Appx. 823, 825 (11th Cir. 2014) (quoting *Alvarez v. Royal Atlantic Devlopers, Inc.*, 610 F.3d 1253, 1265 (11th Cir. 2010)).

Alternatively, the Court may examine the parties' evidence and determine whether the evidence, viewed in the light most favorable to Ms. Martin, "presents 'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'" *Smith v. Lockheed-Martin*

*Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011) (quoting *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 733 (7th Cir. 2011)). "Whatever form it takes, if the circumstantial evidence is sufficient to raise 'a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.'" *Chapter 7 Trustee v. Gate Gourmet, Inc.*, 683 F.3d 1249, 1256 (11th Cir. 2012) (quoting *Lockheed-Martin Corp.*, 644 F.3d at 1328). A "plaintiff retains 'the ultimate burden of persuading the court that she has been the victim of intentional discrimination.'" *Flowers*, 803 F.3d at 1336 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)).

The basic facts relating to the Board's hiring decision are undisputed. As an African-American, Ms. Martin is a member of a protected class. *See* 42 U.S.C. 2000e-2(a). She was qualified for the registrar/data manager position, but the Board did not hire her. Instead, the Board selected Ms. George, a Caucasian, for the registrar/data manager position.

The Board has provided a race-neutral reason for its decision. Mr. Dixon testified that the interview panel decided to recommend Ms. George to the Board for the registrar/data manager position because the "consensus among the [interviewers] was that Ms. George would have done the best job and was the best choice." (Doc. 12-2, p. 17). The Eleventh Circuit has held that when an employer

selects another candidate over the plaintiff because the other candidate, in the decisionmaker's assessment, "was the best fit for the position," the "best fit" explanation is a non-discriminatory reason that satisfies the employer's burden of production. *Jenkins v. National Waterworks, Inc.*, 502 Fed. Appx. 830, 832 (11th Cir. 2012).

To carry her burden of identifying a question of fact regarding discriminatory intent, Ms. Martin argues that evidence of inaccuracies, inconsistencies, and contradictions in the Board's explanation of its hiring decision establishes that racial discrimination was the real reason for the decision. The Court has examined the inaccuracies that Ms. Martin has described and has considered those inaccuracies standing alone and in combination to determine whether the record contains evidence that creates a question of fact regarding discriminatory intent.

Not all of the inaccuracies that Ms. Martin describes find support in the record. For example, Ms. Martin contends that the panel members indicated that they recommended Ms. George for the registrar/data manager position because she "was already performing the job of Registrar/Data Manager," but Ms. George "had not done so, and she had no access to INOW, the program required" to perform the work of the registrar. (Doc. 18, p. 17). A false explanation such as that might be

evidence of discriminatory intent, but Ms. Martin's characterization of the panel's rationale is inaccurate. The panel members indicated that they knew that Ms. George had subbed for the registrar when the registrar was out (Doc. 12-2, Dixon Depo., p. 28; Doc. 12-7, Pack Depo., p. 26; Doc. 12-9, Miller Depo., p. 25), but they did not say that Ms. George already was serving as the registrar. Ms. George testified that she had subbed for front office staff over her years as a Board employee. (Doc. 12-12, p. 4). In his affidavit, Mr. Dixon stated that Ms. George's experience as a substitute in the front office and her familiarity with how the front office operated gave him confidence that Ms. George "would provide a smooth transition following Ms. Key's retirement." (Doc. 12-3, ¶ 13). The Court does not find evidence of an inaccuracy regarding the panel's consideration of Ms. George's front office experience as a factor in the panel's recommendation of Ms. George for the registrar position.

Likewise, Ms. Martin's argument that there is conflicting information about Ms. Pack's role in the decision to hire Ms. George rests on a misunderstanding of the record. Ms. Martin contends that "there are contradictions in defense testimony as to who was the decision-maker" because "[a]lthough Ms. Pack recently testified by Affidavit that she was a decision-maker, she expressly denied being a decision-maker when she testified in deposition." (Doc. 18, p. 18). In her

affidavit, Ms. Pack does not explicitly state that she was a decision-maker. Ms. Pack states that when the panel completed interviews, she, Mr. Dixon, and Ms. Miller discussed all of the candidates and ranked them. (Doc. 12-8, ¶ 5). Everyone on the panel agreed that Ms. George and Ms. Zoll were "the two best candidates." The panel "talked some more and came to a consensus that Ms. George was the best choice." (Doc. 12-8, ¶ 5). In her deposition, Ms. Pack testified that Mr. Dixon made the decision to recommend Ms. George for the registrar position. (Doc. 12-7, Pack Depo., p. 29). This testimony is consistent with Mr. Dixon's statement that the consensus of the panel members was that Ms. George had the best interview, that the panel had an "open discussion," but that the "final decision" was his. (Doc. 12-2, Dixon Depo., pp. 89, 92). There are no inconsistencies in the testimony concerning the interview panel's discussion of the candidates and Mr. Dixon's ultimate decision to recommend Ms. George as the person that the Board should hire.

Ms. Martin argues that she may establish discriminatory intent by proving that she was not permitted to work in the front office and that the Board did not hire African-Americans for support staff positions in the front office at Vincent Middle High School. In her declaration, Ms. Martin stated that she has "always been denied the opportunity to work in the front office." (Doc. 19-1, ¶ 5). In her

deposition, Ms. Martin acknowledged that she has volunteered in the front office helping assemble report cards and stuff envelopes. (Doc. 12-1, Martin Depo., p. 51).

Ms. Martin's testimony that the Board historically has not hired African-Americans in support staff positions in the front office at Vincent Middle High School standing alone does not establish that the Board's decision to hire Ms. George was racially motivated. A plaintiff may rely on statistics to establish pretext, but "[s]tatistics without any analytical foundation" are not sufficient evidence of discriminatory intent. *Evans v. McClain of Ga., Inc.*, 131 F.3d 957, 963 (11th Cir. 1997) (quoting *Brown v. Am. Honda Motor Co.*, 939 F.2d 946, 952-53 (11th Cir. 1991), *cert. denied,* 502 U.S. 1058 (1992)). Ms. Martin has not provided evidence about the number of front office support staff vacancies at Vincent Middle High School or the race of the individuals who applied for the positions. Under binding Eleventh Circuit precedent, in the absence of this type of this contextual information, Ms. Martin's statistical evidence does not create a material question of fact concerning pretext. *See Wilson*, 376 F.3d at 1088 (plaintiff's statistical evidence that defendant selected only two females for 44 open vice president positions was not probative of pretext because the plaintiff did not provide "other relevant information, including the number of women who

expressed interest in vice president positions"); *Brown*, 939 F.2d at 952 ("To say that very few blacks have been selected by Honda does not say a great deal about Honda's practices unless we know how many blacks have applied and failed and compare that to the success rate of equally qualified white applicants.").[7]

Another component of Ms. Martin's circumstantial evidence of intent is evidence that the Board deviated from its standard interview procedure when the Board hired Ms. George. "[A]n employer's deviation from its own standard procedures may serve as evidence of pretext." *Hurlbert v. St. Mary's Health Care System, Inc.*, 439 F.3d 1286 (11th Cir. 2006). Here, the interview committee did not follow Board policy of ranking candidates based on numerical scores. In fact, the members of the interview panel agreed in advance to eschew the numerical scoring altogether. In addition, for some but not all of the questions, the interview panel did not compare a candidate's answer to the model answers that appeared on the interview form. (Doc. 12-9, pp. 6-7). It is unclear from the record whether the Board's policy was to automatically recommend for hire the candidate who received the highest interview score or whether the candidate who received a high score gained an advantage at all in the selection process. Logic suggests, though,

---

[7] The Court recognizes that there are instances in which an employer's historic practice of hiring only men or only Caucasians may chill application rates for members of protected classes. The Court also recognizes that it may be difficult to capture this chilling effect statistically. Here, the Court has no data that would allow the Court to begin a statistical analysis.

that that is the point of the objective numerical ranking system. Viewing the evidence in the light most favorable to Ms. Martin, a jury could conclude that the Board adopted the objective scoring and ranking process to eliminate bias from the interview process and that panel members scuttled the interview ranking process for a "comprehensive approach" because they anticipated that objective rankings would favor Ms. Martin rather than the panel's chosen candidate.

Ms. Martin also has argued that the panel members' post-hiring rationale for selecting Ms. George contradicts the Board's criteria for the registrar/data manager position. The evidence favors Ms. Martin in this regard. Post-hiring, the panel members testified that they were primarily concerned with hiring someone who would be a one-person welcoming committee because the registrar is the first person many parents and students meet at the school. (Doc. 12-3, ¶ 12; Doc. 12-7, p. 11; Doc. 12-8, ¶¶ 9-10; Doc. 12-10, ¶ 8). The Board's criteria for the position have a much different focus. Of the 16 listed criteria for the position, eight focus on data management qualifications, four concern general qualifications, and four concern people skills. *See* pp. 9-10 above. Of the 15 standard interview questions for the position, six concern data management, seven concern general considerations for the position, and two address people skills. *See* pp. 11-12 above. Again, viewed in the light most favorable to Ms. Martin, jurors reasonably

could conclude that the members of the interview panel deviated from the Board's criteria for the position so that they could select their favored candidate rather than the candidate who would rank well based on the Board's job criteria.

With respect to the candidates' relative qualifications based on the Board's objective criteria, Ms. Martin argues that it is "implausible" that Ms. George's "work experience could be deemed superior to" hers (Ms. Martin's). (Doc. 18, p. 18). Generally speaking, "a plaintiff cannot prove pretext merely by arguing or showing that [s]he was more qualified than the person who received the position." *Licausi v. Symantec Corp.*, 378 Fed. Appx. 964, 966 (11th Cir. 2010) (citing *Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1349 (11th Cir. 2007)). "[A] plaintiff must show that the disparities between the successful applicant's and h[er] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Springer*, 509 F.3d at 1349 (internal quotation marks and citation omitted). That is because a court does not "sit as a 'super-personnel department.'" *Alvarez*, 610 F.3d at 1266 (quoting *Chapman v. A1 Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). Ms. Martin offers her superior qualifications not as her only evidence of discriminatory intent but as one piece of a mosaic of circumstantial evidence. The Court considers her evidence in

that context.

Ms. Martin believes that she is more qualified than Ms. George for the registrar/data manager position because:

> I have had more experience, I have access to INOW, I have a lot of office experience as far as working in front offices with the experience of being in charge – I meant site secretary at after-school care, I have data entry, I have a degree in computers, which clearly, you know, enabled me to move around in it and learn it fairly quickly. . . . Working with my company, just basically the job experience itself, and receiving outstanding evaluations, knowing that I can – you know, and some of the factors in that is working effectively, working under stress, following directions, and those were some of the things that were listed for the job.

(Doc. 12-1, p. 23). In a side-by-side resume comparison with Ms. George, Ms. Martin clearly wins. (*Compare* Doc. 12-11, p. 58 *with* Doc. 19-12, p. 1). Ms. Martin has a degree in computer programming and extensive computer training and work experience. (Doc. 12-1, pp. 5, 9-10, 47; Doc. 19-12, p. 1). Mr. Dixon recognized Ms. Martin's proficiency in this area by asking her to work with software while monitoring students during in-school detention. (Doc. 19-9, p. 2). The record reflects that Ms. Martin has received excellent evaluations, and she has received numerous awards. (Doc. 12-1, pp. 15-16; Doc. 19-1, ¶¶ 2, 9; Doc. 19-9; Doc. 19-10).

According to the Board, Ms. Martin's computer science degree or computer programming experience did not distinguish her as a candidate because the

registrar/data manager position did not require computer training or experience. (Doc. 12-3, ¶ 17; Doc. 12-7, pp. 5, 11). The Board's position is inconsistent with the job requirements for the registrar position, many of which call for skills relating to data entry and computer systems. (Doc. 19-4, p. 1).

Viewed only in comparison to Ms. George, Ms. Martin's evidence regarding the panel's interview procedures and her qualifications relative to Ms. George's qualifications could raise a question of material fact concerning discriminatory intent. But Ms. Martin was not the only applicant disadvantaged by the Board's comprehensive approach to evaluating candidates. Ms. Gibson, a Caucasian candidate whose computer and technical skills are comparable to Ms. Martin's, also was disadvantaged.

Ms. Gibson has worked at Vincent Middle High School since 1999, the same year that Shelby County hired Ms. Martin as a substitute teacher. (Doc. 12-1, pp. 12, 58; Doc. 12-11, p. 68). Ms. Gibson originally worked as a computer lab aide, and then she became the receptionist at Vincent Middle High School. (Doc. 12-11, p. 68).[8] As a computer lab aide, Ms. Gibson scheduled classes for computer lab times and maintained the computers in the lab. (Doc. 12-11, p. 68). As Vincent Middle High School's receptionist, Ms. Gibson answers the phone,

---

[8] It is unclear how many years Ms. Gibson worked as the computer lab aide.

transfers calls, takes messages, communicates with parents, students, and faculty, and files students' school excuses. (Doc. 12-11, p. 68). On her resume, Ms. Gibson states that her skills include "[e]xtensive knowledge/experience with using INow computer software," and "[e]fficient at using Microsoft Word, Excel, and PowerPoint." (Doc. 12-11, p. 68). In addition, Ms. Gibson's resume highlights her "[e]xcellent communication skills" and "[e]xceptional time management skills," both of which are characteristics that Mr. Dixon believed were required for the registrar position. (Doc. 12-11, p. 68; *see* Doc. 12-3, ¶ 12). Like Ms. Martin, Ms. Gibson's objective qualifications for the registrar/data manager position far exceed Ms. George's qualifications.

Because the interview panel did not numerically score Ms. Martin or Ms. Gibson, the interview committee's failure to follow the Board's procedure affected Ms. Gibson in the same way that it affected Ms. Martin.[9] The same is true with respect to the interview panel's decision not to consider whether the candidates provided answers similar to the suggested answers on the interview form. Both Ms. Martin, an African-American candidate, and Ms. Gibson, a Caucasian candidate, were equally disadvantaged by the panel's interview procedure. The

---

[9] Mr. Dixon gave Mr. Gibson numerical scores, but Ms. Pack and Ms. Miller did not. (Doc. 12-11, pp. 59-67). Ms. Martin and Ms. George did not receive numerical scores. (Doc. 12-11, pp. 38-46, 49-57).

Eleventh Circuit has held that "[i]t is difficult to hold that a practice which affects applicants of all races in the same manner is actually designed to conceal a racially discriminatory motive." *Brown*, 939 F.2d at 952. Because the inconsistencies in procedure and implausibilities in hiring rationale affect applicants of all races in the same manner, those inconsistencies and implausibilities do not give rise to a question of fact regarding discriminatory intent.

In sum, Ms. Martin has not presented sufficient circumstantial evidence that would allow a jury to infer discriminatory intent or conclude that the Board's proffered reason for not hiring her for the registrar/data manager position is pretext for discrimination based on her race. Therefore, the Court will enter judgment as a matter of law in favor of the Board on Ms. Martin's Title VII race discrimination claim.

**B.      Ms. Martin's § 1983 Claims Against the Individual Defendants**

**1.      Official Capacity Claims Against Mr. Fuller, Ms. Aubrey Miller, Ms. Hill, Mr. Bice, Ms. Hampton, and Mr. Morris[10]**

"[W]hen an officer is sued under Section 1983 in his or her official capacity, the suit is simply another way of pleading an action against an entity of which an officer is an agent." *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991)

---

[10] Throughout this opinion, the Court has referred to Vincent Middle High School Counselor Maite Miller as Ms. Miller. To avoid confusion, the Court refers to Board member Aubrey Miller by her first and last name.

(internal quotation marks, citations, and footnote omitted). Therefore, the Court construes Ms. Martin's § 1983 official capacity claims as a § 1983 claim against the Shelby County Board of Education.

"The analysis of a disparate treatment claim is the same whether that claim is brought under Title VII, § 1981, or § 1983." *Hopkins v. Saint Lucie Cty. School Bd.*, 399 Fed. Appx. 563, 565, (11th Cir. 2010) (citing *Rice–Lamar v. City of Ft. Lauderdale, Fla.*, 232 F.3d 836, 843 n.11 (11th Cir. 2000)); *see Richardson v. Leeds Police Dep't*, 71 F.3d 801, 805 (11th Cir. 1995) ("In a case such as this alleging disparate treatment, in which § 1983 is employed as a remedy for the same conduct attacked under Title VII, the elements of the two causes of action are the same. . . . In both instances, the plaintiff must prove that the defendant acted with discriminatory intent."). As explained above, *see supra* pp. 19-32, Ms. Martin has not presented evidence creating triable issues of fact with respect to her Title VII claim against the Board. Therefore, the individual defendants, in their official capacities, are entitled to judgment as a matter of law on Ms. Martin's § 1983 race discrimination claim.

> ### 2. Individual Capacity Claims Against Mr. Fuller, Ms. Aubrey Miller, Ms. Hill, Mr. Bice, Ms. Hampton, and Mr. Morris

Ms. Martin contends that the individual defendants acting in their individual capacities violated her Fourteenth Amendment equal protection right to be free

from race discrimination by hiring Ms. George for the registrar/data manager position. "The Equal Protection Clause ensures a right to be free from intentional discrimination based upon race." *Williams v. Consolidated City of Jacksonville*, 341 F.3d 1261, 1268 (11th Cir. 2003). To establish a § 1983 equal protection race discrimination claim, Ms. Martin "must prove discriminatory motive or purpose." *Cross v. State of Ala., State Dep't of Mental Health & Mental Retardation*, 49 F.3d 1490, 1507 (11th Cir. 1995).

Mr. Fuller, Ms. Aubrey Miller, Ms. Hill, Mr. Bice, Ms. Hampton, and Mr. Morris are entitled to summary judgment on Ms. Martin's individual capacity § 1983 claims because the individual defendants did not deprive Ms. Martin of a constitutionally protected right. The record is undisputed that Mr. Dixon submitted to the Board's human resources department a recommendation to hire Ms. George, and the human resources department passed along the recommendation to Mr. Fuller. (Doc. 12-2, p. 16; Doc. 12-4, p. 3; Doc. 12-6, p. 12). Mr. Fuller submitted the recommendation to the Board, and the Board voted to approve the recommendation to hire Ms. George. (Doc. 12-5, ¶ 13; Doc. 12-6, p. 15; Doc. 12-11, p. 124).

Mr. Fuller did not review the applications for the registrar/data manager position. (Doc. 12-6, p. 7). There is no evidence in the record that Mr. Fuller

discussed with Mr. Dixon which candidates were interviewed or the race of the applicants, and the record is undisputed that the Board members were unaware of the race of the candidates before the Board voted. (Doc. 12-5, ¶ 13). Accordingly, Ms. Martin has not established that Mr. Fuller, Ms. Aubrey Miller, Ms. Hill, Mr. Bice, Ms. Hampton, or Mr. Morris personally acted with a discriminatory motive or engaged in conduct that constitutes a violation of the equal protection clause. *See Brown v. City of Huntsville, Ala.*, 608 F.3d 724, 737 (11th Cir. 2010) ("To establish § 1983 liability, a plaintiff must show proof of an affirmative causal connection between a government actor's acts or omissions and the alleged constitutional violation, which may be established by proving that the official was personally involved in the acts that resulted in the constitutional deprivation.") (internal quotation marks and citation omitted).

Ms. Martin contends that Ms. Pack and Mr. Dixon "were acting as the Board" in the hiring process, and therefore, under the "cat's paw" theory of liability, Ms. Pack and Mr. Dixon "were the biased non-decision makers whom the Board members relied upon in reaching the racially discriminatory adverse employment decision." (Doc. 18, p. 24) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011)). Under the "cat's paw" theory of liability, an employer may be "liable when the decision-maker has no discriminatory animus but is influenced by a

subordinate supervisor's action that is the product of such discriminatory animus." *Sims v. MVM, Inc.*, 704 F.3d 1327, 1335 (11th Cir. 2013). As explained above, *see supra* pp. 22-32, Ms. Martin has not shown that race motivated either the interview committee's conclusion that Ms. George was the best candidate for the registrar/data manager position or Mr. Dixon's final decision to recommend Ms. George for hire. Therefore, Ms. Martin has not shown that the individual board members were "influenced by the conduct of [the interview committee] that is the product of [] discriminatory animus." *Daniel v. Dekalb Cty. School Dist.*, 600 Fed. Appx. 632, 637 (11th Cir. 2014) (citing *Staub*, 562 U.S. at 411). Consequently, the Court will enter judgment as a matter of law in favor of the individual defendants on Ms. Martin's individual capacity § 1983 claims.

## IV. CONCLUSION

For the reasons explained above, the Court **GRANTS** the defendants' motion for summary judgment. By separate order, the Court will enter judgment as a matter of law in favor of the defendants on all of Ms. Martin's claims.

**DONE** and **ORDERED** this March 6, 2018.

_Madeline H. Haikala_
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE